UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

MARIBEL IGLESIAS-SERRANO,

                    Plaintiff,            16 Civ. 418

   -against-                              OPINION

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                    Defendant.

------------------------------------X

A P P E A R A N C E S :

          Attorneys for Plaintiff

          LAW OFFICE OF DANIEL BERGER
          1000 Grand Concourse, Suite 1-A
          Bronx, NY 10451
          By:  Daniel Berger, Esq.


          Attorneys for Defendant

          PREET BHARARA
          United States Attorney
          Southern District of New York
          One Saint Andrew's Plaza
          New York, NY 10007
          By:  David L. Brown, Esq.

**Sweet, D.J.**

Maribel Iglesias-Serrano ("Plaintiff" or "Serrano") moved for review, pursuant to 42 U.S.C. § 405(g), of the Social Security Administration Commissioner Carolyn Colvin's ("Defendant" or "Colvin") denial of her application for Supplemental Security Income ("SSI") benefits.  The parties have cross-moved for judgment on the pleadings.  As set forth below, the Plaintiff's motion is granted, and the Defendant's motion is denied.

**Prior Proceedings**

On January 13, 2016 Plaintiff filed the instant action challenging the denial of her SSI benefits.  Plaintiff filed an application for her Title XVI SSI benefits on December 5, 2012. (Administrative Record from Defendant's Answer ("R.") 19, 61.) Plaintiff requested a hearing after her benefits were denied. (R. 19, 75-77.)  Administrative Law Judge ("ALJ") Hilton R. Miller held a hearing on Plaintiff's claim on June 25, 2014. (R.19.)  ALJ Miller denied the claim on September 10, 2014.  (R. 19-33.)  Plaintiff appealed ALJ Miller's decision to the Appeals

1

Council, which denied Plaintiff's appeal on December 2, 2015.
(R. 1-7.)

Plaintiff's motion on the pleadings was taken on
submission and marked fully submitted on August 18, 2016.
Defendant's cross motion on the pleadings was taken on
submission and marked fully submitted on September 1, 2016.

**The Facts**

At Plaintiff's June 25, 2014 hearing, Plaintiff
testified about the pain and permanent injuries she claimed she
experienced.  Plaintiff testified that she has pressure and pain
in her lower back.  She testified that she experiences numbness
in her legs.  (Record "R." at 37.)  Plaintiff testified that she
has to elevate her legs all the time.  R. at 38.  She has tried
medications, therapy, injections, and surgery.  R. at 38.  She
testified that the injections make the pain go away for 2-3
days, but then it comes back.  R. at 38.  Plaintiff testified
that she can sit for about 20 minutes, but then needs to walk
around and she can only stand for 20 minutes before needing to
sit.  R. at 39.  She last worked as a babysitter in 2012 and
also worked as a home health aide.  R. at 40.  She is 5 feet and
7 inches tall and weighs approximately 213 pounds.  R. at 42.

Plaintiff also testified that she suffers from a series of mental health issues, including depression and anxiety and that she has been treated for those ailments for four to five years. R. at 43-44. She has been prescribed medications for those ailments, but the medications make her drowsy and nauseous. R. at 44-45. Plaintiff testified that she cries frequently and gets anxious when around crowds. R. at 45.

In addition to Plaintiff, several other people testified at the June 25, 2014 hearing. Raymond Cestar testified as a Vocational Expert. R. 47-50, 121-122. Cestar testified that a hypothetical person with Plaintiff's residual functional capacity (as described to Cestar by the ALJ) could not perform the jobs of waitress, home attendant, babysitter, and bartender. R. at 49. However, Cestar testified that this hypothetical person could be a clerical worker, account clerk, or an assembler. R. at 50.

The parties submitted several assessments from Plaintiff's treating physicians and the Government's non-treating physicians. Those are summarized here:

Dr. Guoping Zhou

3

On September 3, 2013, Dr. Guoping Zhou, Plaintiff's treating physician, submitted a medical source statement.  R. at 645-652.  This statement diagnosed Plaintiff with chronic neck pain with cervical disc herniations and chronic back pain with disc herniation.  R. at 646-52.  The medical source statement also stated that Plaintiff experiences pain severe enough to interfere with her attention and concentration, and that she has a marked limitation on her ability to deal with work stress.  R. at 647.

Dr. Zhou in the medical source statement opined that Plaintiff could only sit or stand continuously for 30 minutes, and that Plaintiff would also need more rest than just a morning break, lunch period, and an afternoon break.  R. at 649.  Dr. Zhou opined that in an eight-hour day, Plaintiff could only sit for a maximum of three hours, stand or walk for three hours, but would need to lie down or recline for four hours.  The statement also stated that Plaintiff could never lift more than 10 pounds and could never stoop, flex, or rotate her neck, and could only occasionally use her hands and fingers.  R. at 650.  Dr. Zhou stated that she did not need a hand held assistive device for walking.  R. at 651.

Dr. Zhou also submitted a Wellness Plan Report on September 25, 2012 for the New York City Human Resources Administration's ("HRA") public assistance program.  R. at 381-82.  This report noted that Plaintiff had back and neck pain, which was worsened by prolonged standing, walking, or heavy lifting.  R. at 381.  Dr. Zhou noted that physical therapy and medication were being used to treat Plaintiff's cervical and lumbar spine impairments and the condition had been resolved or stabilized.  R. at 381-382.  Dr. Zhou opined that Plaintiff was temporarily unemployable for three months.  R. at 382.

<u>Dr. Edward Fruitman</u>

Plaintiff saw Dr. Edward Fruitman as a treating physician for depression and anxiety.  R. at 546, 561, 566, 568, 570, 575-76.  In February 2011, Plaintiff reported experiencing stress relating to her son's incarceration, but that her mood had improved by taking Cymbalta (though with some side effects).  R. at 575.  Plaintiff's symptoms returned in November 2011 when a neurologist took her off Cymbalta, but stabilized by February 2012 when she started taking Effexor.  R. at 566.  In August 2012 Dr. Fruitman switched Plaintiff back to Cymbalta when her insurance would not pay for Effexor, but she reported no side effects.  R. at 561.

On June 27, 2013, Dr. Fruitman submitted a Medical Source Statement.  R. at 640-644.  This statement noted that Dr. Fruitman had diagnosed Plaintiff with Panic Disorder, Anxiety, Depression, and appetite disturbance with weight change, sleep disturbance, mood disturbance, difficulty thinking or concentrating, suicidal ideations, decreased energy, manic syndrome, among other ailments.  R. at 640-41.  Dr. Fruitman reported prescribing Plaintiff with Cymbalta, Ambien, and Doexin.  R. at 640-644.  Dr. Fruitman opined that Plaintiff would be absent about three days a month because of her impairment and treatments.  R. at 641.

This report noted that Plaintiff has a marked loss in her ability to pay attention for longer than two-hour segments, sustain an ordinary routine, and adhere to basic standards of neatness and cleanliness.  R. at 643.  Dr. Fruitman noted a number of other problems such as Plaintiff's ability to interact appropriately with the public, request assistance, respond appropriately to criticism from supervisors, or use public transportation.  R. at 642-43.

Dr. John Fkiaras

6

Dr. Fkiaras conducted an exam of Plaintiff as a non-treating physician on March 22, 2013.  R. 623-626.  Dr. Fkiaras found that Plaintiff displayed a normal gait and stance, was able to do a full squat, walked on heels and toes without difficulty, and needed no help changing for her exam or getting on and off the exam table.  R. at 624.  Plaintiff experienced pain upon light touch to the low back and cervical neck.  R. at 625.  However, Dr. Fkiaras found Plaintiff had full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally in her cervical spine and lumbar spine.  R. at 625. She had a full range of motion of her shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally.  R. at 625.  Her strength was a five out of five in the upper and lower extremities and in her hands.  R. at 625.

Plaintiff reported to Dr. Fkiaras that she engaged in childcare daily and was able to shower, dress, and clean.  R. at 623-24.  She cooked three times per week with assistance and did laundry and shopping once a week with assistance.  R. at 623-24.

Dr. David Mahony, Ph.D.

Dr. David Mahony is a psychologist, who met with the Plaintiff on April 3, 2013 at the request of Social Security for

a psychiatric consultative examination.  R. at 627-30.

Plaintiff traveled by subway to the exam by herself.  R. at 627.

Plaintiff reported that she was able to dress, bathe, and groom

herself and perform all household activities of daily living.

R. at 627.  She stated that she socialized with her friends and

family and spent time at home.  R. at 629.

Dr. Mahony noted that Plaintiff reported a depressed

mood, crying spells, irritability, argumentative behavior, sleep

problems, increased appetite, and weight gain.  R. at 627-28.

She denied suicidality since a suicide attempt 15 years before

the examination by Dr. Mahony.  R. at 628.  She reported

symptoms of anxiety, though Dr. Mahony noted that those symptoms

more accurately reflected irritability.  R. at 628.  He found

Plaintiff to be cooperative with clear speech and coherent

thought processes.  Her affect was of full range and

appropriate, her mood was euthymic, and she was fully oriented.

R. at 628.  Plaintiff exhibited intact attention and

concentration as well as intact recent and remote memory skills.

R. at 629.  Dr. Mahony found that Plaintiff was not addressing

her obesity.  R. at 629.  He also determined that she was able

to understand simple directions, perform simple tasks

independently, maintain a regular schedule, learn new tasks, and

perform complex tasks.  R. at 629.  Dr. Mahony found a mild

limitation relating to others and dealing with stress, but not
to a degree impacting her ability to function on a daily basis.
R. at 629.  He noted her prognosis as poor because she did not
appear motivated to return to work.  R. at 630.


Dr. Henry Sardar


Plaintiff saw Dr. Henry Sardar for pain management
regularly between February and November 2012.  R. at 604-09,
614-18.  Dr. Sardar noted that Plaintiff was taking several
medications that were providing satisfactory analgesia control
and a cervical trigger point injection was markedly helpful for
a prolonged amount of time.  R. at 608.  Dr. Sardar observed
that Plaintiff was pleasant, in no apparent distress, fully
oriented and with good attention to hygiene.  Her mood and
affect were normal with no sign of depression or anxiety.  R. at
608.  Plaintiff had decreased range of motion in her lumbar
spine, and she had significant spasm, taut muscle bands, and
tenderness to palpation over the lumbar paraspinal region.  R.
at 608.  Dr. Sardar recommended physical therapy and gave
Plaintiff a left sacro iliac joint injection.  R. at 608.


In September and November 2012, Plaintiff reported to
Dr. Sardar that her condition had worsened and she was

experiencing an increase in pain.  R. at 614, 616.  Dr. Sardar administered another trigger point injection in September 2012. R. at 616-17.

On November 27, 2012, Taesoo Kim, a registered physician's assistant who worked in Dr. Sardar's office, completed a wellness plan report for HRA.  This report noted that the MRI showed multilevel disc herniations at the cervical spine and lumbar spine and therefore concluded that Plaintiff's condition had not resolved and that Plaintiff would not be able to work for at least 12 months.  R. at 385.

Plaintiff saw Dr. Sardar on January 8, 2013 and reported constant shooting neck pain.  R. at 696.  Plaintiff was taking a series of medicines, which were reportedly helpful.  R. at 696.  Plaintiff was pleasant, overweight, under no apparent distress, good eye contact, and had good attention to hygiene. R. at 696.  Her condition showed diminished sensation over the C5-C6 dermatome on the left side.  R. at 696.  On February 5, 2013, Dr. Sardar gave Plaintiff a trigger point injection to the left levator scapula, which she tolerated well.  R. at 610-11.

On February 8, 2013 Dr. Sardar evaluated the Plaintiff and administered a trigger point injection to the left cervical paraspinal muscle.  R. at 692-93.

### Federal Employment and Guidance Service

The Federal Employment and Guidance Service ("FEGS") conducted multiple biopsychosocial evaluations of Plaintiff prior to her application for SSI.  R. at 212-341.  In 2010, Dr. Nichele Nivens evaluated Plaintiff and found Plaintiff had an abnormal gait and station, abnormal spine, slow gait and paraspinal tenderness.  R. at 313.  Dr. Nivens diagnosed depression, PTSD, anxiety, ADHD, a herniated disc in her back, neck pain, and arthritis.  R. at 315.

On June 19, 2012, Plaintiff underwent an additional FEGS evaluation.  The social worker reported that Plaintiff was not interested in working.  R. at 324.  Plaintiff reported that she cared for her twin daughters, attended physical therapy twice a week, monthly mental health appointments, cooked, cleaned, read, watched television, and socialized online.  R. at 330.  She was able to travel without limitations, but had trouble motivating herself to make appointments.  R. at 329.

Doctors at All Med


Plaintiff saw Dr. Gabriel Dassa on January 11, 2010 for cervicolumbar radiculopathy with lumbar and cervical disk protrusional abnormalities.  R. at 541.  Dr. Dassa found increased myospasms from C1-C7 extending into Plaintiff's trapezius region of her cervical spine and increased myospasms from L1 to L5 extending into the lumbosacral junctions.  R. at 541.  Spurling and straight leg raise tests were positive on the right side and her gait was asymmetrical.  R. at 541-42.


On January 27, 2010, Plaintiff saw Dr. Monica Martin, who noted Plaintiff should meet with an orthopedist, a neurologist, and a pain management professional in February. She referred Plaintiff to psychiatry.  R. at 578.  Plaintiff next saw Dr. Martin on July 22, 2011 after a trip from Puerto Rico.  Dr. Martin reported that Plaintiff had no complaints and referred her to doctors for lumbar and cervical radiculopathy. R at 573.


Plaintiff saw Dr. Ashok Dubey at All Med on July 26, 2012 for neck and lower back pain.  R. at 529.  Dr. Dubey diagnosed Plaintiff with cervical spine disc herniation at C3-C4, C5-C6, and C6-C7 documented on an MRI of the cervical spine

from March 2011, and lumbar spine disc herniation at L4-L5
documented on an MRI of the lumbar spine from December 2010.  R.
at 529-530.  A spurling test was negative, but her range of
cervical spine motion was slightly decreased.  R. at 529.
Plaintiff experienced tenderness at L4-L5, but sensation and
motor function were intact in her lumbar spine and the straight
leg test, Babinski test and clonus signs were all negative.  R.
at 529-530.  Dr. Dubey recommended Plaintiff continue with
physical therapy, see pain management, and her neurologist, and
receive another referral to a neurosurgeon.  He recommended a
lumbar spine brace to provide support.  R. at 530.

### Medical Records

In addition to consultations with several doctors,
Plaintiff had several diagnostic tests taken.  On December 8,
2010 Plaintiff had an MRI of the lumbar spine, which revealed
central disc herniation at L4-L3 disc level impinging upon the
anterior thecal sac.  R. at 584.  On March 9, 2011, Plaintiff
had an MRI of the cervical spine, which revealed muscle spasm
and multilevel disc herniations.  R. at 585-86.  There were
central disc herniations noted at C3-C4 and C4-C5, a left
paracentral disc herniation at C5-C6, and a right paracentral
disc herniation at C6-C7, which is encroaching on the anterior

13

thecal sac.  There was no cord compression or spinal stenosis.
R. at 585–86.

### The ALJ's Opinion

On September 10, 2014 ALJ Miller issued his decision
finding that the Claimant was not disabled under the Social
Security Act.  R. at 29.  ALJ Miller found that because of her
back, neck, and mental health issues, the Petitioner could not
perform any past relevant jobs such as a waitress, home
attendant, or bartender.  R. at 27.  However, ALJ Miller found
that the Petitioner had the residual functional capacity to
perform sedentary work as defined in 20 C.F.R. 416.967(a)
including the ability to lift up to 10 pounds, stand or walk for
two hours with normal breaks, and sit with normal breaks for six
hours in an eight hour day.  R. at 23.  Further, the ALJ found
that Petitioner was not disabled because she was capable of
performing unskilled sedentary jobs or which there are a
sufficient number in the national economy.

**Applicable Standard**

"Our review of the Social Security Administration's
'final decision denying a SSI disability benefits claim is not

de novo; it is limited to inquiring into whether the Secretary's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

Substantial evidence must amount to "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). However, "it is still a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012).

**The ALJ Made Legal Errors and the Decision Is Not Supported by Substantial Evidence**

The ALJ's conclusion that the Plaintiff had the Residual Functional Capacity to perform sedentary work was not supported by substantial evidence.  Plaintiff argues that the ALJ failed to apply the correct legal standard when he only accorded "some weight" to the opinion of the treating physician,

Dr. Zhou and "limited weight" to the opinion of the treating

psychiatrist, Dr. Fruitman.  These arguments fail because Dr.

Zhou's and Dr. Fruitman's opinions were not consistent with

other substantial evidence in the record.  However, the ALJ

failed to consider the evidence that Plaintiff is likely to miss

several days of work each month for health reasons and that the

vocational expert testified that no sedentary job would allow

for Plaintiff to miss even one day per month.


**The ALJ Did Not Err in the Weight Given to Dr. Zhou and Dr. Fruitman**

Dr. Zhou and Dr. Fruitman were the Plaintiff's

treating physicians and were considered with "some weight" and

"limited weight" respectively by the ALJ.  These determinations

were not legal error because they were supported by substantial

evidence in the record as a whole.


The treating physicians rule states that " 'expert

opinions of a treating physician as to the existence of a

disability are binding on the fact finder unless contradicted by

substantial evidence to the contrary.' "  *Alston v. Sullivan*, 904

F.2d 122, 126 (2d Cir. 1990) (quoting *Bluvband v. Heckler*, 730

F.2d 886, 892 (2d Cir. 1984); *Bastien v. Califano*, 572 F.2d 908,

912 (2d Cir. 1978)).  When evaluating whether there is

substantial evidence in the record to support the doctor's opinions, "'we review the record as a whole. This means that in assessing whether the evidence supporting the Secretary's position is substantial, we will not look at that evidence in isolation but rather will view it in light of other evidence that detracts from it.'" *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (quoting *State of New York v. Secretary of Health and Human Services*, 903 F.2d 122, 126 (2d Cir. 1990).

The ALJ awarded "some weight" to Dr. Zhou's opinion because it was "only partially consistent with the evidence of record, which includes diagnostic tests revealing cervical and lumbar degenerative disc disease." R. at 27. Looking at the evidence "as a whole" Dr. Zhou's limitations for the Plaintiff were not substantially supported by the other doctors' reports because of the activities Plaintiff was performing on a regular basis. Dr. Zhou opined that in an eight-hour day, Plaintiff could only sit for a maximum of three hours, stand or walk for three hours, but would need to lie down or recline for four hours. R. at 23; R. at 645-649. While Dr. Zhou was Plaintiff's treating physician, Plaintiff reported to Dr. Fkiaras (who was not a treating physician) that she engaged in childcare daily and was able to shower, dress, and clean. R. at 623-24. She cooked three times per week with assistance and did laundry and

17

shopping once a week with assistance.  R. at 623-24.  These
observations are not consistent with someone who would have such
extreme limitations to her ability to stand or sit and the
requirement that she lie down for at least four hours out of an
eight-hour work day.

Dr. Zhou further opined that Plaintiff could never
lift more than 10 pounds and could never stoop, flex, or rotate
her neck.  R. at 650.  However, these conclusions are
contradicted by the observations by Dr. Fkiaras, who found that
Plaintiff displayed a normal gait and stance, was able to do a
full squat, walked on heels and toes without difficulty, and
needed no help changing for her exam or getting on and off the
exam table.  R. at 624.  While Dr. Zhou found that Plaintiff
could only occasionally use her hands and fingers (R. at 650),
Dr. Fkiaras found that Plaintiff's strength was a five out of
five in the upper and lower extremities and in her hands.  R. at
625.  Further as mentioned above she was doing many activities
with her hands and fingers on a daily basis such as showering,
dressing, and cleaning and she was cooking three times per week.
R. at 623-24.

Plaintiff argues that the ALJ erred in giving "limited
weight" to Dr. Fruitman because he was a treating physician.  R.

18

at 26.   However as the ALJ noted, Dr. Fruitman's assessment that Plaintiff has moderate to marked limitations in her ability to understand and carry-out instructions and his assessment that she had marked limitation in her ability to maintain socially appropriate behavior were both inconsistent with other areas of Dr. Fruitman's own report.  R. at 26.  For example, in contrast to these marked limitations on her ability to work and function, Dr. Fruitman observed that Plaintiff had only slight limitations on her ability to perform activities of daily living with social functioning and concentration.  R. at 26.

Dr. Fruitman's conclusions were also inconsistent with Dr. Mahony's observations that the Plaintiff was able to dress, bathe, groom herself, take the subway alone, and perform all household activities of daily living.  R. at 627.  The ALJ's conclusion to not credit Dr. Fruitman's conclusions was reinforced by Dr. Mahoney's finding that Plaintiff was cooperative with clear speech and coherent thought processes, even though she certainly reported a depressed mood, crying spells, and irritability.  R. at 627-628.  Inconsistent with Dr. Fruitman's conclusions, Dr. Mahoney found that Plaintiff could pay attention and was able to understand simple directions, perform simple tasks independently, maintain a regular schedule, learn new tasks, and perform complex tasks.  R. at 629.  In

19

contrast to Dr. Fruitman's conclusion that Plaintiff would have marked limitations with important skills needed to return to work, Dr. Mahoney concluded that Plaintiff did not appear motivated to return to work.  R. at 630.

**The ALJ's Failure to Consider the Vocational Expert's Testimony was Legal Error**

During the hearing with the ALJ, a vocational expert provided testimony on whether a person with the Plaintiff's limitations could find employment.  R. at 47-50.  The Vocational Expert testified that a hypothetical person as described with certain limitations by the ALJ could perform sedentary work.  R. 49-50.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence."  *Calabrese v. Astrue*, 358 Fed.Appx. 274, 276-77 (2d Cir. 2009) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)).  However, the hypothetical as explained to the vocational expert must "accurately reflect the limitations and capabilities of the claimant involved."  *Calabrese*, 358 Fed.Appx. at 276-77 (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

In this case, the ALJ asked the vocational expert a hypothetical about whether there would be any jobs for the hypothetical person with Plaintiff's conditions, but that person would "be off task 20 percent of the time." R. at 50. The vocational expert testified that there would be no jobs for such a person. R. at 50. Further, counsel asked the vocational expert if there would be any sedentary jobs that the hypothetical individual could hold if they would be absent "more than one day a month." R. at 50. The vocational expert testified that there would be no jobs for that person. R. at 50.

The ALJ considered the vocational expert's testimony regarding his opinion that the hypothetical person described could perform the requirements of unskilled sedentary jobs available in sufficient numbers in the national economy. R. at 28. However, in making his determination that the Plaintiff was not disabled the ALJ did not consider the vocational expert's testimony that there would be no jobs available to the Plaintiff if she was off task 20% of the time or missed more than one day of work per month.

The issue is whether it was harmless error for the ALJ to fail to consider this testimony. Based on the testimony from

the Plaintiff and the medical professionals, substantial evidence supports the conclusion that Plaintiff may be off task 20% of the time and would miss more than one day per month because of her ailments.

First, the Plaintiff testified at her June 25, 2014 hearing about the physical and mental pain that she experiences. Plaintiff testified that she has pressure and pain in her lower back as well as numbness in her legs. R. at 37.  Plaintiff testified that she has to elevate her legs all the time.  R. at 38.  Sometimes Plaintiff cannot walk.  R. at 37.  She has tried medications, therapy, injections, and surgery.  R. at 38.

Plaintiff also testified that she suffers from a series of mental health issues, including depression and anxiety and that she has been treated for those ailments for four to five years.  R. at 43-44.  She has been prescribed medications for those ailments, but the medications make her drowsy and nauseous.  R. at 44-45.  Plaintiff testified that she cries frequently and gets anxious when around crowds.  R. at 45. Sometimes when she experiences depression, she will not leave the house for 1-2 weeks at a time.  R at 46.  The Plaintiff's treating physician also corroborates this link between her depression and inability to always go to work.  Dr. Fruitman

opined that Plaintiff would be absent about three days a month because of her mental health impairment and treatments.  R. at 641.

Plaintiff's physical ailments could also cause her to miss more than one day of work per month.  For example, between February 2012 and February 2013 Plaintiff saw Dr. Henry Sardar for pain management.  R. at 604-09, 614-18.  Dr. Sardar recommended physical therapy and gave Plaintiff at least four trigger point injections to help manage her increasing pain during this time period.  R. at 608, 610-11, 616-617, 692-93. Plaintiff testified that the injections make the pain go away for 2-3 days, but then it comes back.  R. at 38.

This pain was not only reported by the Plaintiff to her doctors; it was substantiated by two MRIs showing multilevel disc herniations at the cervical spine and lumbar spine.  On December 8, 2010 Plaintiff had an MRI of the lumbar spine, which revealed central disc herniation at L4-L3 disc level impinging upon the anterior thecal sac.  R. at 584.  On March 9, 2011, Plaintiff had an MRI of the cervical spine, which revealed muscle spasm and multilevel disc herniations.  R. at 585-86.

Plaintiff saw Dr. Nichele Nivens from The Federal
Employment and Guidance Service, who diagnosed Plaintiff with
depression, PTSD, anxiety, ADHD, a herniated disc in her back,
neck pain, and arthritis.  R. at 315.  In June 2012, Plaintiff
reported she was going to physical therapy twice a week and
monthly mental health appointments.  R. at 330.  Plaintiff saw
Dr. Ashok Dubey at All Med on July 26, 2012 for neck and lower
back pain.  R. at 529.  Dr. Dubey diagnosed Plaintiff with
cervical spine disc herniation at C3-C4, C5-C6, and C6-C7
documented on an MRI of the cervical spine from March 2011, and
lumbar spine disc herniation at L4-L5 documented on an MRI of
the lumbar spine from December 2010.  R. at 529-530.  Dr. Dubey
recommended Plaintiff continue with physical therapy, see pain
management, and her neurologist, and receive another referral to
a neurosurgeon.  R. at 530.

The substantial evidence supports the conclusion that
in order to manage Plaintiff's numerous medical conditions, she
will miss work more than one day per month.  The ALJ's failure
to even address this issue of how much time Plaintiff would miss
in a month based on her ailments and the vocational expert's
testimony that there would be no unskilled sedentary employment
available for a person who missed more than one day per month
was legal error.  *Gallagher v. Astrue*, No. 10 Civ.

24

8338(LTS)(AJP), 2012 WL 987505, at *22 (S.D.N.Y. Mar. 22, 2012)

(R&R adopted, 2012 WL 1339357 (Apr. 17, 2012)) (finding that

substantial evidence did not support finding of no disability

when ALJ failed to address the vocational consultant's testimony

that there would be no jobs for someone who would miss three

days per month); *Geraw v. Comm'r of Soc. Sec.*, No. 11 Civ 32,

2011 WL 6415475, at *7 (D. Vt. Dec. 21, 2011) ("The ALJ

improperly failed to address the latter portion of [the treating

physician's] opinion-that [the claimant] would miss work

approximately two days each month. This failure was not

harmless, considering that the [vocational expert] testified

that 'there would be no jobs' for an employee who was absent

from work two or more days each month.")

**Conclusion**

      For the reasons stated above, substantial evidence does not support the ALJ's determination that the Plaintiff is not disabled.   Plaintiff's motion for judgment on the pleadings is granted and the Government's cross-motion is denied.   The case is remanded to the Commissioner of Social Security for proceedings consistent with this opinion.

      It is so ordered.

New York, NY
December 23, 2016

_____
ROBERT W. SWEET
U.S.D.J.